TINA C. RODRIQUEZ, APPELLANT AND CROSS-APPELLEE, V. PRIME MEAT PROCESSORS, ALSO KNOWN AS PRIME INTERNATIONAL CORPORATION, ALSO KNOWN AS VMI CORPORATION, ET AL., APPELLEES, AND FIREMAN'S FUND INSURANCE COMPANY, APPELLEE AND CROSS-APPELLANT.

421 N.W.2d 32

Filed March 25, 1988.    No. 87-696.

Michael J. Mooney of McCormack, Cooney, Mooney & Hillman, and Mino St. Lucas of St. Lucas & Kenny, for appellant.

Melvin C. Hansen and Allen J. Potts of Hansen, Engles & Locher, P.C., for appellee Aetna/Cigna Insurance.

Ronald E. Frank of Sodoro, Daly & Sodoro, for appellee Fireman's Fund.

BOSLAUGH, CAPORALE, and GRANT, JJ., and RIST and CLARK, D. JJ.

CAPORALE, J.

Plaintiff, Tina C. Rodriquez, filed an action for workers' compensation benefits against her employer, appellee Prime Meat Processors, and its insurers, appellee and cross-appellant Fireman's Fund Insurance Company and appellee Aetna/Cigna Insurance Companies. Dissatisfied with the benefits awarded her, Rodriquez appeals, assigning three errors which combine to challenge the compensation court's factual finding that the disabilities of her upper extremities (arms) resulted from separate accidents, and its legal conclusion that the relevant portion of Neb. Rev. Stat. § 48-121(3) (Cum. Supp. 1986) applies only when a worker has sustained disabilities to two or more specified members of the body as the result of a single accident. In its cross-appeal Fireman's Fund asserts the compensation court erred in assessing against it a waiting time payment and attorney fee. We affirm as modified.

## FACTS

Rodriquez was born on February 2, 1925, is divorced, is possessed of an eighth grade education, and has no skills suiting her for any employment other than manual labor. She was employed by Prime Meat Processors as a laborer in 1975 and continued that employment until February 2, 1985.

During that period of time, Rodriquez suffered two work-related accidents which are the subject of this litigation, the first

of which occurred on November 4, 1981, and the second on July 27, 1982. On November 4, 1981, Rodriquez fell and as a result suffered a disability to her right arm. The details of this accident are not in dispute and need not be recited here.

On July 27, 1982, Rodriquez suffered a second fall. In testimony at the initial hearing held on September 10, 1986, Rodriquez described this accident as follows:

[Rodriquez]. . . . So I was carrying this box and I just put — you know, was going over there when I felt my foot slip and I let the box go. I just let the box go because I figured it wasn't worth it and I fell and when I fell, I put this hand down because this one was already sore and I didn't want to hurt this any more.

Q. You braced yourself with [your] left hand because your right hand was already sore?

[Rodriquez]. That's right. So then I just put this down and I was on my knees.

Q. You fell to your knees bracing yourself with your left hand?

[Rodriquez]. Yes. I kept this hand down so then I couldn't get up and there was two girls, two Mexican girls that came up to me and asked me what had happened. I said I really didn't know. It happened so fast I didn't know. So then they helped me get up. When I got up my hand was already this big.

Q. Which hand?

[Rodriquez]. My left hand. . . .

. . . .

Q. All right. Now let's go back to the second fall again. When you fell to the floor while you were moving the box in July of 1982 did you brace your fall with your right hand?

[Rodriquez]. No.

Q. Just your left hand?

[Rodriquez]. I put this hand — this is the one.

Q. You are indicating your left hand?

[Rodriquez]. Yes. I knew that if I put this one down I was going to have more problems than what I already had.

Q. So you claim that there was no additional injury to

the right hand in the fall of July 1982?

[Rodriquez]. I just put my hand down like this and I felt a little something and it pulled because I knew what was going to happen so I just braced myself here. That's why the fall was all here.

At appellee Aetna/Cigna's insistence Rodriquez consulted Dr. Bernard Kratochvil, an orthopedic surgeon. On February 15, 1985, Kratochvil wrote that "because of the disability to the upper extremities, [Rodriquez] is unable to return to her former work. Because of her age, experience, and education, she is not employable."

On January 17, 1986, Kratochvil wrote,

It is my opinion that the patient has a 20 percent permanent partial impairment of the right upper extremity as a result of the injury in November of 1981 [and] that she has a 20 percent permanent partial impairment of the left upper extremity as a result of the July 1982 injury.

On May 7, 1986, Kratochvil wrote that Rodriquez "was last seen in our office on the 4th of April of 1986. It is my opinion that Tina Rodriguez [sic] remains unemployable. It is my opinion that as of April 4th, 1986, she has reached maximum medical benefit."

The rehearing of Rodriquez' case was held on February 11, 1987. Rodriquez' testimony at this proceeding essentially repeated that of the initial hearing, with the notable exception of her testimony regarding the facts of her second fall. On direct examination in the rehearing, Rodriquez engaged in the following colloquy with her attorney:

[Rodriquez] . . . I was going over there when I slipped and I didn't realize what was really happening to me until I fell, and I let the box go and I put both of my hands down, but like I said, I babied this one (indicating) a little bit, and when I heard it crack, then I — well, I really wasn't worried about this hand (indicating) at all.

Q Which hand?

[Rodriquez] My right hand, because it was already injured and I didn't care because I thought I had broken my hand.

Q Which hand?

[Rodriquez] My left hand, you know, when I fell.

Q I'm not sure I understand your testimony now. You're saying that you fell and you injured both hands on the second fall?

[Rodriquez] Yes, both hands, right. I put both hands down.

Q There has been received in evidence a transcript of your testimony at the first trial of this case, and in that trial you said you only injured your left hand in the second fall. Now you've changed your mind. Why?

[Rodriquez] Why? Because at that time, I didn't remember. I was kind of confused. It's been so long and so much has gone on that I just didn't think about it. And then when I went back and found my own notes that I had written —

Q That's Exhibit No. 15.

[Rodriquez] Yes. — I realized what really had happened.

Rodriquez represented that she had written an account of the second accident on June 22, 1985, for a purpose or purposes unstated in the record; it is this account to which she refers as exhibit 15 in the above quotation. It is of note that Rodriquez also gave and signed a statement dated October 7, 1982, which also purports to be an account of her second accident. The October 7 statement was also admitted into evidence at the rehearing; it differs from Rodriquez' testimony at the rehearing and tends to corroborate her story as told at the initial hearing.

Kratochvil testified by deposition as follows, on direct examination conducted on Rodriquez' behalf:

Q. Now, let me ask you at this point if all of those operations that you have been [talking] about so far have been on the right hand and arm?

[Kratochvil]. That's correct.

Q. Doctor, do you have an opinion with reasonable medical certainty as to the cause of the injuries necessitating those treatments?

[Kratochvil]. Yes.

Q. What is your opinion?

[Kratochvil]. It was the result of an injury which occurred in November of 1981.

. . . .

Q. Can you tell me did you also treat the left hand and arm?

[Kratochvil]. Yes.

Q. Tell me about that, give me the history and bring that up to date.

[Kratochvil]. She sustained an injury to the left upper extremity in July of 1982.

On cross-examination conducted on behalf of Fireman's Fund, Kratochvil testified:

Q. Was it your understanding that on the second accident that occurred on July 27 of 1982 that she had injured her left upper extremity and either injured her right upper extremity or right hand, or at least aggravated a prior injury?

[Kratochvil]. I believe that's the way she described it.

On cross-examination conducted on behalf of Aetna/Cigna, Kratochvil testified:

[Kratochvil]. I started to take care of Tina Rodriquez after Dr. Klein became ill and wasn't able to practice, and I think possibly, I wasn't aware of the fact that this had anything to do with a work-related injury, or at least I didn't think it was that involved. As time went on and I treated her on several occasions and operated on her, I found out there were two separate injuries, and there were two separate extremities involved at the time of each injury. So I proceeded to try to get the facts. Now, I'm not sure whether I got them from the patient or from her attorney, but the point is I finally tried to summarize the whole affair and I came up with this information, that she had injured herself in November of 1981 and that involved the right hand and shoulder; a second injury occurred in July of 1982 which involved the left upper extremity. Then she had had surgery on six different occasions involving both upper extremities, both hands, both thumbs.

Q. And I believe you testified earlier that the treatment which you have provided and the condition which you

have described to the right hand I believe is a result of the injury of November, 1981?

[Kratochvil]. Yes.

Q. And to the left hand the result of the injury of July, 1982?

[Kratochvil]. Yes.

On recross-examination conducted on behalf of Fireman's Fund, Kratochvil testified as follows:

Q. Doctor, without regard to the extent of impairment to Tina Rodriquez' either left arm or [right] arm, I want to represent to you one of the problems that has arisen in this case is whether or not Tina Rodriquez suffered injuries, an injury to her right arm also when she fell in July of 1982, and apparently through some notes that you have gone through that are outside your chart, based upon your conversations with either Tina Rodriquez or her attorney or both, you have resolved at least in your mind that in 1981 she had an injury to the right arm and in July of '82 she had an injury to the left arm, is that correct?

[Kratochvil]. That's correct.

Q. But at the time you offered . . . the July 6, 1984 report, at that time you had interpreted the records as having something to do with an injury to her right upper extremity when she fell in July of 1982, is that correct?

[Kratochvil]. Yes.

Q. Today you are now correcting that in essence, is that basically what you are saying?

[Kratochvil]. Well, it has been very difficult to sort out the facts, and I'm not certain that the patient has them on the tip of her tongue. However, the way I understand it is that she had an injury to the right upper extremity in the November, 1981 accident, then she had another accident where she slipped and fell in July of '82 and this time she injured the left upper extremity. I don't have any information that would indicate that she also injured or aggravated the condition of her right upper extremity in July of 1982. I don't have any facts one way or the other.

Q. But your medical opinion today is that in 1981 she injured her right arm and in 1982 she injured her left arm?

[Kratochvil]. That's the way I understand it.

Q. That's your opinion within reasonable medical certainty today?

[Kratochvil]. Yes.

Following the rehearing, the compensation court awarded Rodriquez certain medical and hospital expenses, vocational rehabilitation services, and temporary total disability benefits for the period from March 12, 1984, through April 4, 1986, as a result of the first accident, and for the periods from May 11 through September 10, 1983, and from June 26, 1984, through April 4, 1986, as a result of the second accident. The court rejected Rodriquez' contention that she is permanently totally disabled as a result of the partial loss of use of both her arms and awarded her permanent partial disability benefits based on a 20-percent loss of use of her right arm as the result of the first accident and a 20-percent loss of use of her left arm as the result of the second accident.

At the time of Rodriquez' first accident, Prime Meat Processors was insured by Fireman's Fund, and at the time of the second accident by Aetna/Cigna. For a time, the two insurers paid equal shares of Rodriquez' temporary total disability benefits. However, apparently on the basis of Kratochvil's statement in his written report of July 6, 1984, that Rodriquez sustained both of her injuries during the second accident, Fireman's Fund stopped making payments on April 11, 1985.

## CAUSE OF DISABILITIES

In reviewing workers' compensation cases this court is not free to weigh the facts anew; rather, it accords to the findings of the compensation court the same force and effect as a jury verdict in a civil case. Thus, the factual findings of the compensation court on rehearing will not be set aside unless clearly wrong. *Hernandez v. Farmland Foods*, 227 Neb. 629, 418 N.W.2d 765 (1988); *Kuticka v. University of Nebraska-Lincoln*, 227 Neb. 565, 418 N.W.2d 593 (1988); Neb. Rev. Stat. § 48-185 (Cum. Supp. 1986). In testing the sufficiency of the evidence to support the findings of the compensation court on rehearing, every controverted fact must be resolved in favor of the successful party, who is to have the benefit of every

inference that can be drawn therefrom. *Kingslan v. Jensen Tire Co.*, 227 Neb. 294, 417 N.W.2d 164 (1987).

A finding with regard to causation of an injury is one for determination by the compensation court as the fact finder. *Kingslan v. Jensen Tire Co., supra.* Given Rodriquez' conflicting versions of how she sustained her injuries and disabilities, it cannot be said the compensation court's finding on rehearing that the disability of Rodriquez' right arm resulted from the first accident and that of her left arm from the second accident is clearly wrong.

## COMPENSABILITY OF DISABILITIES

The compensation court on rehearing found that notwithstanding Rodriquez' inability "to perform work for which she has previous training or experience," she was not entitled to permanent total disability benefits, explaining that the following language of § 48-121(3) applies only when multiple members are injured and the resultant disabilities are the product of a single accident:

> In any case in which there shall be a loss or loss of use of more than one member or parts of more than one member set forth in this subdivision, but not amounting to total and permanent disability, compensation benefits shall be paid for the loss or loss of use of each such member or part thereof, with the periods of benefits to run consecutively. The total loss or permanent total loss of use of both hands, or both arms, or both feet, or both legs, or both eyes, or hearing in both ears, or of any two thereof, in one accident, shall constitute total and permanent disability and be compensated for according to the provisions of subdivision (1) of this section. [Subdivision (1) specifies the benefits for total disability.] In all other cases involving a loss or loss of use of both hands, both arms, both feet, both legs, both eyes, or hearing in both ears, or of any two thereof, total and permanent disability shall be determined in accordance with the facts. . . . In all cases involving a permanent partial loss of the use or function of any of the members mentioned in this subdivision, the compensation shall bear such relation to the amounts named in said subdivision as the disabilities bear to those

produced by the injuries named therein.

Single member permanent disabilities are compensated under an earlier portion of § 48-121(3), which provides in pertinent part:

> For disability resulting from permanent injury of the following classes, the compensation shall be in addition to the amount paid for temporary disability; *Provided*, the compensation for temporary disability shall cease as soon as the extent of the permanent disability is ascertainable, viz: . . . . For the loss of an arm, sixty-six and two-thirds per cent of daily wages during two hundred twenty-five weeks [but not more nor less than the amounts specified in Neb. Rev. Stat. § 48-121.01 (Cum. Supp. 1986)].

Rodriquez contends the court below misread the multiple-member disability language of § 48-121(3), claiming that a worker who sustains the partial loss of use of two or more members as the result of separate compensable accidents may, if he or she is in fact rendered totally disabled thereby, receive total disability benefits.

In reaching its conclusion that the multiple-member language of § 48-121(3) applies only when two or more members are injured in the same accident, the compensation court relied upon *Krijan v. Mainelli Constr. Co.*, 216 Neb. 186, 342 N.W.2d 662 (1984); Rodriquez correctly observes that this reliance was misplaced. Although the *Krijan* court observed that the injured worker in that case had suffered permanent partial disability of two members in one accident as well as prior injuries in a separate accident, that observation was not directed to the question presented in this case. Indeed, in *Krijan* there was neither dispute as to whether the injury to both members was in fact sustained in a single accident, nor argument that the language questioned in this case applied only to disabilities arising out of injuries sustained in a single accident. Nevertheless, the compensation court's legal conclusion as to the import of the language at issue is correct.

The question now before us may be phrased as being whether the "in one accident" requirement of § 48-121(3) applies not only to the "total loss or permanent total loss of use of both" specified members, or any two thereof, but as well to "all other

cases involving a loss or loss of use of both" those members, or any two thereof.

In construing a statute it is presumed that the Legislature intended a sensible rather than an absurd result. *County of Lancaster v. Maser*, 224 Neb. 566, 400 N.W.2d 238 (1987); *State v. Sinica*, 220 Neb. 792, 372 N.W.2d 445 (1985); *Reed v. McClow*, 205 Neb. 739, 290 N.W.2d 186 (1980). It would be outrageously absurd indeed to provide that one who totally lost, or lost the total use of, multiple members could receive total disability benefits if and only if such occurred in a single compensable accident, but provide that one who lost something less than all of two or more members, or lost something less than the total use of two or more members, could receive total disability benefits although such disabilities were produced by different compensable accidents. There is no basis upon which we can conclude that such an absurd intention lurked in the minds of our legislators. Quite the opposite is true; the legislative history establishes the intent to have been "to change the method of paying workmen's compensation when two members of an injured employee's body suffer less than total disability *in one accident* to provide that compensation be paid for each member separately." (Emphasis supplied.) Introducer's Statement of Purpose, L.B. 807, Labor Committee, 83d Leg., 2d Sess. (Jan. 29, 1974). The statements made by a judge of the compensation court during the course of the committee's hearing on L.B. 807, if such statements constitute a part of the legislative history—a matter we need not and do not decide—do not, contrary to Rodriquez' suggestion, belie the introducer's statement of purpose. Prior to the enactment of L.B. 807, the relevant statutory language provided:

The loss of both hands, or both arms, or both feet, or both legs, or both eyes, or of any two thereof, shall constitute total and permanent disability and be compensated for according to the provisions of subdivision (1) of this section. . . . In all cases involving a permanent partial loss of the use or function of any of the members mentioned in this subdivision, the compensation shall bear such relation to the amounts named in said subdivision as the disabilities bear to those produced by the injuries named

therein.

Section 48-121(3) (Reissue 1974). The judge appearing before the committee explained that frequently the results under that language were inequitable, for a worker sustaining relatively minor multiple-member injuries frequently received more compensation benefits than a worker suffering more severe injury to the body as a whole. He then went on to explain that under L.B. 807,

> if there is a two member disability which actually results in a total permanent disability, he would be totally and permanently disabled and would get the maximum for life. So he would be protected, the one who is seriously injured. If he completely loses two members, it is a presumption in the law. If it is something less than a 100% of two members, and, in fact, results in total permanent, he would get total permanent. But if it is something less than total permanent, he would not get lifetime benefits, which he does get at present.

Labor Committee Hearing, L.B. 807, 83d Leg., 2d Sess. 3 (Feb. 6, 1974). We read the judge's comments to have been made within the context of the introducer's statement; he was therefore explaining the consequences of injuries to multiple members arising from a single accident. We do not read his comments to claim that L.B. 807 would operate irrespective of the number of accidents involved. Indeed, he could not have so claimed, for it must be remembered that the schedule of benefits contained in § 48-121 (Cum. Supp. 1986) is subject to the requirement contained in Neb. Rev. Stat. § 48-101 (Reissue 1984), that there be personal injury "caused . . . by accident," not accidents. (Emphasis supplied.) (L.B. 807 made no change in § 48-101.)

## PAYMENT FOR WAITING TIME AND ATTORNEY FEE

This then brings us to the cross-appeal of Fireman's Fund. Where there is no reasonable controversy regarding an employee's claim for workers' compensation, Neb. Rev. Stat. § 48-125 (Cum. Supp. 1986) authorizes the award to the employee of an attorney fee and a 50-percent payment for waiting time on delinquent payments. *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987).

Whether a reasonable controversy exists is a question of fact, and this court is bound by the findings of the compensation court on rehearing, to the extent such findings have support in the evidence. *Mendoza v. Omaha Meat Processors, supra; Minshall v. Plains Mfg. Co.*, 215 Neb. 881, 341 N.W.2d 906 (1983).

While it is true that Kratochvil's report of July 6, 1984, created doubt as to whether the first accident, which is the only one Fireman's Fund covered, caused temporary total disability, there is no question but that temporary total disability existed and that under the circumstances, the employer, Prime Meat Processors, was liable therefor, irrespective of which of the two accidents caused it. Thus, the compensation court on rehearing erred only in not assessing the waiting time payment and attorney fee against the employer, thereby leaving the employer and its insurers free to resolve which insurer owed the contractual obligation to indemnify the employer, a question which was of no concern to Rodriquez. See *Franklin v. Pawley*, 215 Neb. 624, 340 N.W.2d 156 (1983), wherein the appellant Pawley, a contractor, argued that the school for which he was working at the time employee Franklin was injured was Franklin's true employer by action of statute, and therefore liable for Franklin's injuries. For his part, Franklin cross-appealed, seeking an award of a waiting time penalty and an attorney fee. After refuting Pawley's argument, this court reinstated the waiting time penalty and attorney fee awarded on initial hearing, but denied on rehearing, and noted that "the record discloses that there was no reasonable controversy as between Pawley and Franklin. Whether [the school] was a statutory employer and therefore jointly and severally liable would not in any manner have affected Pawley's independent liability." *Id.* at 630, 340 N.W.2d at 160.

The provisions of Neb. Rev. Stat. § 48-146 (Cum. Supp. 1986), requiring that policies insuring liability arising under the Nebraska Workers' Compensation Act provide that jurisdiction over the insured shall be jurisdiction over the insurer and that the insurer shall in all things be bound by the awards, judgments, or decrees rendered against the insured, do not authorize the compensation court to ignore the separate

identities of the insured and insurer.

## DECISION

Accordingly, the award of the compensation court on rehearing is affirmed but modified to the extent, and only to the extent, that the waiting time payment and attorney fee assessed against Fireman's Fund be assessed against Prime Meat Processors.

While the cross-claim filed by Fireman's Fund did not succeed in reducing the amount of the award, neither did Rodriquez respond to the cross-claim. Thus, Rodriquez is not entitled to the award of an attorney fee in this court under the provisions of § 48-125.

AFFIRMED AS MODIFIED.

GRANT, J., dissenting.

I respectfully dissent. As noted in the majority opinion, the compensation court found that although plaintiff was unable to perform work for which she had previous training or experience, she was not entitled to permanent total disability benefits for the stated reason that Neb. Rev. Stat. § 48-121(3) (Cum. Supp. 1986), while permitting a finding of total disability when a worker suffers a two-member partial disability in one accident, does not authorize such a finding where a worker suffers the same partial disabilities in *two* accidents. It seems to be undisputed by the compensation court or the parties that after incurring the second accident, the plaintiff was totally disabled. Therefore, as a result of two accidents, 8 months apart, occurring while plaintiff was working for the same employer, she was rendered 100 percent disabled.

It seems to me that we are considering form over substance in approving the compensation court's findings in this case. It is true that § 48-121(3) mandatorily provides: "The total loss or permanent total loss of use of both hands, or both arms, or both feet, or both legs, or both eyes, or hearing in both ears, or of any two thereof, in one accident, *shall* constitute total and permanent disability . . . ." (Emphasis supplied.)

The sentence following that just quoted in § 48-121(3) reads: "In all other cases involving a loss or loss of use of both hands, both arms, both feet, both legs, both eyes, or hearing in both

ears, or of any two thereof, total and permanent disability shall be determined in accordance with the facts."

The Workers' Compensation Act should be liberally construed so as to accomplish the beneficent purposes of the act. *Spiker v. John Day Co.*, 201 Neb. 503, 270 N.W.2d 300 (1978); *Behrens v. American Stores Packing Co., ante* p. 18, 421 N.W.2d 12 (1988). *Spiker, supra* at 506, 270 N.W.2d at 303, further states: "The policy of the act should not be thwarted by technical refinements of interpretation."

If the result of plaintiff's injuries in two cases is "determined in accordance with the facts," this plaintiff, in this case, would be awarded permanent total disability benefits.

It appears to me that, in the case before us, the statute must be so construed. I would reverse.

BOSLAUGH, J., joins in this dissent.